IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


KEVIN HOLLINGSHEAD,

                    Petitioner,

      v.                              CASE NO. 13-3148-SAC

STATE OF KANSAS, et al.,

                    Respondents.


MEMORANDUM AND ORDER

     Petitioner is incarcerated in the Kansas correctional
system.  This case is before the court upon petitioner's
application for a writ of habeas corpus pursuant to 28 U.S.C. §
2254.

I.  ISSUES BEFORE THE COURT

     Petitioner was convicted of attempted first-degree murder
and aggravated burglary.  His first trial ended in a mistrial.
The mistrial was requested by petitioner's trial counsel after
the prosecutor introduced into evidence and played for the jury
a recording of petitioner's interrogation which was not redacted
in the manner ordered prior to trial.  Petitioner's counsel
asked that a second trial be barred on double jeopardy grounds.
This request was denied.  Petitioner was convicted at the
conclusion of the second trial.  In his application for a writ
of habeas corpus, petitioner raises two issues:  1) that his

rights against double jeopardy under <u>Oregon v. Kennedy</u>, 456 U.S. 667 (1982) were violated; and 2) that during closing argument at the second trial the prosecutor improperly urged the jury to consider petitioner's post-<u>Miranda</u> silence in violation of <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976).[1]

II.  STATE TRIAL COURT PROCEEDINGS

     A.  <u>Proceedings before the first trial</u>

     Prior to the first trial, petitioner moved to suppress a recording of petitioner's interview by the police on the basis of <u>State v. Elnicki</u>, 105 P.3d 1222 (Kan. 2005).  In <u>Elnicki</u>, the Kansas Supreme Court held that it was error to admit into evidence a recording of an interview with a criminal defendant in which a police detective repeatedly denigrated the credibility of the defendant. Petitioner's trial counsel set forth in his motion the parts of the interview which he claimed should be redacted pursuant to the <u>Elnicki</u> case.  The prosecutor agreed to redact those parts of the interview.   The court ordered that the redactions be made.   This occurred in July 2007.  Late on a Friday, before the Monday start to petitioner's first trial in November 2007, the prosecutor supplied a copy of the redacted recording to petitioner's defense counsel. Petitioner's counsel asked if the <u>Elnicki</u> redactions had been made and the prosecutor responded affirmatively.   Defense

---

[1] Petitioner has voluntarily dismissed a third issue he raised in his petition, regarding newly discovered evidence.  Doc. No. 3.

counsel, however, did not review the recording prior to it being played at trial.

    B.  <u>First trial proceedings</u>

During the first trial, Patrick Metsinger, the alleged victim in this matter, testified that he was ambushed and attacked by petitioner in the apartment where he was living at approximately 9:00 a.m. on September 13, 2006. He stated that his father leased the apartment and allowed Metsinger to stay there. Metsinger's father was not in the apartment every night, but he was there on the night before the incident in question in this case. About Labor Day 2006, a friend named Clayton Adams brought a woman named Nicole Golden to the apartment. She began staying at the apartment and she and Metsinger shared methamphetamine and sexual relations over a period of several days. According to Metsinger, around midnight or during the early morning hours of September 13, 2006, he grew tired of how Golden was acting and told Golden that she had to take her things and leave the apartment. She called someone to pick her up. Metsinger testified that around 9:00 a.m. he was awakened by his cell phones ringing. When he walked from his bedroom, he saw Golden in the hallway of his apartment. As he walked by her, he asked what she was doing there and immediately thereafter he was attacked by petitioner with a small ax and a machete. Metsinger testified that petitioner had been crouched

in the kitchen hidden from his view and that petitioner wore a ski mask. They struggled for some time. Petitioner struck Metsinger's head with the ax. Metsinger was able to hit petitioner with a cast iron ladle which may have been a fireplace tool. During the fight Golden stabbed Metsinger with a knife. Petitioner's ski mask came off as the two men battled. Eventually, Metsinger was able to flee the apartment and receive help.

Metsinger told the jury that he was in custody at the time of the first trial. He also admitted to several criminal incidents in his past, including aggravated battery, forgery, theft, and disorderly conduct. He further admitted to being a methamphetamine addict and to selling methamphetamine on occasion.

Golden testified that she had been living with petitioner for months before she starting staying with Metsinger. She and petitioner also shared illegal drugs and sexual relations. She continued to see petitioner while she was staying with Metsinger, but she tried to conceal her relationship with Metsinger from petitioner. At some point in time on the day before the fight in this case, Golden and petitioner had a brief skirmish when petitioner attempted to prevent Golden from leaving a vehicle to walk to Metsinger's apartment.

Golden testified that she called petitioner to pick her up at a nearby supermarket when Metsinger kicked her out of the apartment. She testified that Metsinger had physically assaulted her when he told her to leave. According to Golden, when she told this to petitioner and as it became clear to petitioner that she and Metsinger had had a sexual relationship, petitioner talked about killing Metsinger. Golden testified that she and petitioner used cocaine and methamphetamine and then planned to go to Metsinger's apartment after his father had left to go to work. She said they entered the apartment when petitioner easily kicked in a back door which had previously been broken. She testified that their plan was to kill Metsinger. Petitioner was wearing a ski mask and hid in the kitchen area of the apartment while Golden yelled for petitioner. According to Golden, petitioner attacked Metsinger with a small ax when Metsinger walked into the living room area and toward the kitchen. Golden indicated that she participated in the attack somewhat halfheartedly.

Golden was in custody at the time of the first trial, serving a sentence after pleading guilty to aggravated burglary and aggravated battery in connection with the incident in this case. Her plea bargain and sentence were described to the jury as well as her criminal history and personal history. She described extensive drug use and stated that she and Metsinger

had been awake and using methamphetamine for several days. She also described a drug sale she conducted while Metsinger was along on the night before the incident. She further mentioned shoplifting with Metsinger the same night. Additionally, Golden admitted to committing perjury in an earlier statement to law enforcement.

The prosecutor decided to play the redacted recording on the third day of trial. Prior to doing so, the prosecutor represented to the court that the recording had been redacted to take care of the Elnicki problems. Before the playing of the recording was completed, defense counsel objected that the agreed redactions had not been made. During a conference with the trial judge, the prosecutor said:

> "[E]verything … redacted in this DVD was under my direction, whatever was taken out. Everything left in was my direction. My recollection to the Court's ruling was that all Elnicki was to be taken out, if I was going to play the … video, that I was to give [petitioner's trial counsel] a copy to review."

The prosecutor later said:

> "When I was getting ready for trial, I was operating [with] the plan of making my redacted version[,] giving it to verify and seeing if there are any objections. I tried to start that early. We had technical problems downstairs, which isn't anybody's fault but our own, and I didn't get that [done] until almost the close of the business day on Friday. As for the motion for mistrial, I agreed to redact everything that was [specified] in July … Although I would argue that what has come in is not in violation of Elnicki, … I understand that we didn't have an

6

opportunity to litigate that before because I agreed
to take it out."

The trial judge determined that the prosecutor had agreed
in July 2007 to redact portions of the recording which were not
redacted when the recording was played in November 2007 at
trial.  He granted petitioner's motion for a mistrial.

C.  <u>Proceedings before the second trial</u>

Prior to the second trial, petitioner filed a motion to
dismiss arguing that a second trial would violate petitioner's
rights against double jeopardy.  The trial court conducted a
hearing.  The facts argued at the hearing were largely
undisputed.  The conclusions to be drawn from the facts were
disputed.

Petitioner's counsel argued that the prosecutor acted
intentionally when he played a portion of the improperly
redacted video and that a mistrial was inevitable after the
video was played.  Petitioner's counsel also asserted that the
case was not going well for the prosecution at the time the
video was played because there had been disclosures by Metsinger
and Golden during the trial that had not been made prior to
trial, such as that they had been high on methamphetamine for
six days straight and that Golden had committed perjury in a
sworn statement to the police.

The prosecutor stated that he had not planned on playing the video in trial, but changed his mind.   He said he had forgotten about the stipulated deletions outlined in the motion to suppress in July, but endeavored to take out the portions that obviously violated Elnicki.   He said he provided a copy of the video to petitioner's trial counsel five days before the video was played.

The prosecutor further commented:

"We had problems with redaction.   That's why we sent it as soon as we got them done because I knew if there were other things I needed to take out, it would take time for our office to do that.   We had a lot of problems getting that DVD to play after redactions were made.
    In response to his argument about how well the case was going… this [was] the first time [Golden] participated.   I do believe my case was going better than I anticipated.   I did not attempt to goad them into a mistrial.   I took out everything I thought I needed to take out.   I thought I did from the request from [petitioner's counsel] in July."

The trial judge acknowledged that where a mistrial is essentially orchestrated, a dismissal upon double jeopardy grounds is appropriate.   But, he recognized that not every mistrial justifies dismissal.   The trial judge appeared to consider all the circumstances and remarked that the rule in Elnicki was difficult to apply because there was no bright line. In the end, the trial judge concluded that the prosecutor "made a mistake, and it wasn't a small one, but Oliver Wendell Holmes knows the difference between being kicked and tripped over.   In

this case, the dog was tripped over, it wasn't kicked."  Thus, finding that the prosecutor did not intend to goad petitioner into asking for a mistrial, the court denied the motion to dismiss.

### D.  Second trial proceedings

At the second trial, the testimony of Metsinger and Golden was largely the same as at the first trial.  Petitioner testified that he picked up Golden around 4:00 a.m. on September 13, 2006 at a supermarket near Metsinger's apartment.  He stated that Golden wanted to return to the apartment to pick up some items she had left there, and that he accompanied her reluctantly.  When they did this, according to petitioner's testimony, Metsinger threw out a lamp and a phone belonging to Golden.  After that, petitioner and Golden drove to petitioner's apartment and a short while later Golden asked to return to Metsinger's apartment to retrieve more items.  Petitioner again reluctantly agreed to drive her there.  Petitioner testified that Golden had them stop at a restaurant near Metsinger's apartment where petitioner and Golden worked.  Petitioner stated that Golden left their vehicle and returned with a hatchet which she gave to petitioner.  Petitioner said he was apprehensive of Metsinger who he described as a loose cannon.  According to petitioner, Golden knocked on one door of Metsinger's apartment and when no one answered, they went around to another door which

9

Golden forced open. Petitioner recounted that Metsinger appeared and attacked petitioner, first with a bar stool and then later using an unidentified instrument to hit petitioner on the head. Petitioner fought with Metsinger and eventually struck some blows with the hatchet. Petitioner stated that the fight lasted about a minute and a half and then Metsinger left the apartment.

Petitioner admitted that he spoke with a police detective following his arrest in this case and that what he told the detective was completely different from his trial testimony. He did not claim self-defense when he spoke with the detective and told the detective that he never hurt Metsinger.

During the closing argument of the second trial, the prosecutor referred to petitioner making a statement to the police on the day of his arrest and then "16 months later" testifying in court when he knew various details of the evidence gathered by the prosecution. The prosecutor also made these statements:

> There's only three witnesses, three people that truly know that happened inside that apartment. You heard testimony from all three of them. … I want you to keep in mind … that they also spoke with the police on September the 13th of 2006. And there's an old saying that the water is purest at its source.

> And now suddenly [petitioner] wants to claim self-defense, admitting many of the facts that [Metsinger] has been saying all along, and [Golden] has been saying all along. But he wants to claim

self-defense.  You have to decide who is going to get
the credibility in this case. Out of the three
witnesses in that apartment, there's only one who has
diabolically changed their story in front of you this
week.

Keven Hollingshead has had since September 13th,
2006 to prepare for what he was going to tell you
yesterday about what happened.

III.  HABEAS STANDARDS

The standards this court must apply when reviewing
petitioner's § 2254 challenge to matters decided in state court
proceedings were set forth in Frost v. Pryor, 749 F.3d 1212,
1222-23 (10th Cir. 2014):

> Our review is . . . governed by AEDPA, which "erects a
> formidable barrier to federal habeas relief," Burt v.
> Titlow, --- U.S. ----, 134 S.Ct. 10, 16, 187 L.Ed.2d
> 348 (2013), and "requires federal courts to give
> significant deference to state court decisions" on the
> merits. Lockett v. Trammel, 711 F.3d 1218, 1230 (10th
> Cir.2013); see also Hooks v. Workman, 689 F.3d 1148,
> 1162-63 (10th Cir.2012) ("This highly deferential
> standard for evaluating state-court rulings demands
> state-court decisions be given the benefit of the
> doubt." (quotations omitted)).
>
> Under AEDPA, we may not grant a state prisoner's
> petition under § 2254 with respect to "any claim that
> was adjudicated on the merits in State court
> proceedings" unless the prisoner can show that the
> state court's adjudication of the claim "resulted in a
> decision that was contrary to, or involved an
> unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the
> United States." 28 U.S.C. § 2254(d)(1); see also
> Harrington v. Richter, --- U.S. ----, 131 S.Ct. 770,
> 783-84, 178 L.Ed.2d 624 (2011).
>
> "Clearly established law is determined by the United
> States Supreme Court, and refers to the Court's
> holdings, as opposed to the dicta." Lockett, 711 F.3d

11

at 1231 (quotations omitted). A state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (quotations omitted).

A state court decision is an "unreasonable application" of Supreme Court precedent if "the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams v. Taylor, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (opinion of O'Connor, J.); accord Wiggins v. Smith, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule . . . the more leeway [state] courts have in reaching outcomes in case-by-case determinations." Richter, 131 S.Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)). An "unreasonable application of federal law" is therefore "different from an incorrect application of federal law." Id. at 785 (quoting Williams, 529 U.S. at 410, 120 S.Ct. 1495 (opinion of O'Connor, J.)).

We may "issue the writ" only when the petitioner shows "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. at 786 (emphasis added). Thus, "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." Id. "'If this standard is difficult to meet'—and it is—'that is because it was meant to be.'" Titlow, 134 S.Ct. at 16 (quoting Richter, 131 S.Ct. at 786). Indeed, AEDPA stops just "short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Richter, 131 S.Ct. at 786. Accordingly, "[w]e will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the

remedy." <u>Titlow</u>, 134 S.Ct. at 16 (quoting <u>Richter</u>, 131 S.Ct. at 786).

(footnote omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

IV. PETITIONER'S DOUBLE JEOPARDY CLAIM DOES NOT MERIT HABEAS RELIEF.

The Double Jeopardy Clause of the Fifth Amendment to the Constitution protects a criminal defendant from repeated prosecutions for the same crime. <u>Oregon v. Kennedy</u>, 456 U.S. 667, 671 (1982). When a mistrial is ordered upon the request of a defendant, the proscription against double jeopardy is narrowly applied. <u>Id.</u> at 673. A court must find that the prosecutor intended to provoke the defendant to move for a mistrial, before it may find that a retrial is barred by the Double Jeopardy Clause. <u>U.S. v. Tafoya</u>, 557 F.3d 1121, 1126 (10th Cir.) <u>cert. denied</u>, 557 U.S. 928 (2009). Carelessness or a mistake by the prosecution is insufficient to bar a retrial. <u>U.S. v. Powell</u>, 982 F.2d 1422, 1429 (10th Cir. 1992).

A.   Petitioner's attack upon the state courts' factual findings does not support habeas relief.

Petitioner first argues that habeas relief is justified on double jeopardy grounds because the state courts erred in finding that the prosecutor's action in playing the improperly redacted video was a mistake and not intended to provoke defendant into moving for a mistrial.  This is a factual finding to which the Tenth Circuit has applied a clear and convincing evidence standard.  Housley v. Fatkin, 148 Fed.Appx. 739, 743 (10th Cir. 9/23/2005) cert. denied, 547 U.S. 1024 (2006); Rudolph v. Galetka, 111 Fed.Appx. 565, 572 (10th Cir. 9/28/2004) cert. denied, 544 U.S. 906 (2005); Brown v. Lytle, 2000 WL 350224 *2 (10th Cir.) cert. denied, 531 U.S. 885 (2000).  Petitioner had the burden of proving the intent to provoke a mistrial.  See Earnest v. Dorsey, 87 F.3d 1123, 1130 (10th Cir. 1996)(citing U.S. v. Borromeo, 954 F.2d 245, 247 (4th Cir.), cert. denied, 505 U.S. 1212 (1992)); see also, U.S. v. Barnard, 318 Fed.Appx. 143, 145 (3rd Cir. 2009); U.S. v. Benson, 1993 WL 460960 *3 (9th Cir. 1993) cert. denied, 510 U.S. 1204 (1994).

Petitioner contends that the prosecutor's actions were an intentional effort to provoke a mistrial because:  the prosecutor was aware of the judge-ordered and agreed-to Elnicki redactions in July but failed to make all of them when he was preparing the DVD prior to the November 5, 2007 trial; the

prosecutor told petitioner's trial counsel and the court that he had made the _Elnicki_ redactions; petitioner's trial counsel, not the prosecutor, objected and interrupted the playing of the DVD when objectionable remarks were broadcast; the prosecutor made inconsistent explanations for the failure to make all of the agreed-to redactions; the prosecutor falsely suggested that there was not a clear agreement as to what redactions were to be made; the _Elnicki_ violations were not fully redacted; the prosecutor tried to blame petitioner's trial counsel for failing to check the DVD when the prosecutor only delivered the DVD late on a Friday before a trial set the start the following Monday; and the trial was "devolving into a shambles" for the prosecution before the DVD was entered into evidence.

The court has carefully considered the arguments and the record in this case. We conclude that petitioner has failed to demonstrate with clear and convincing evidence that the prosecutor intentionally provoked a mistrial by playing the improperly redacted DVD. The state court's finding that the prosecutor acted mistakenly and not intentionally is not objectively unreasonable.

A reasonable judge could determine that the prosecutor when preparing for the November trial remembered that _Elnicki_ redactions needed to be made on the DVD but forgot that the prosecution had agreed to make the exact redactions listed by

petitioner's counsel in July.  This would be consistent with the prosecutor telling opposing counsel and the court that the Elnicki redactions had been made, especially given that the Elnicki case does not set forth a bright-line standard.  It would also be consistent with the prosecutor not reacting first to interrupt the playing of the DVD.  Contrary to petitioner, the court does not read the prosecutor's explanations of his actions to be inconsistent or false.  The prosecutor appeared to take responsibility for the errors made in redacting the DVD.

We further reject the assertion that the prosecutor equivocated as to whether an agreement had been made in July regarding the proper redactions.  The prosecutor admitted that he "agreed that I would take out what [petitioner's counsel] requested," but later "forgot about the things about Elnicki [petitioner's counsel] outlined in July."  The court is not convinced by petitioner's assertions that the Elnicki redactions which the prosecutor did make were so inadequate that it proves the prosecutor intended to provoke a mistrial.  Further, the court believes the prosecutor's effort to supply the DVD for advance viewing by petitioner's trial counsel is evidence that the prosecutor did not intend to provoke a mistrial.

Finally, the court is not convinced that the trial had become a shambles for the prosecution when the DVD was admitted.  The evidence was not substantially different between the first

and second trials.   The key witnesses for the prosecution were Metsinger and Golden.   It was well-known to the prosecution that Metsinger and Golden had criminal histories and drug abuse issues that could be problematic.   It was also known that Golden had changed her account of what happened in different sworn statements.   Some aspects of the testimony regarding shoplifting, drug sales and the extent of the drug abuse may not have been anticipated during the first trial.   But, these bits of evidence did not substantially change the landscape of the case.

Recently in U.S. v. Burciaga, 2015 WL 150344 (10th Cir. 1/13/2015), the Tenth Circuit illustrated the narrowness of the exception to the rule that a retrial following a mistrial ordered at a defendant's request does not risk double jeopardy. In Burciaga, the court refused to overturn a finding that a prosecutor did not intend to provoke a mistrial even though the prosecutor asked a question which was "highly improper" and "careless," revealing "poor judgment" and "negligent disregard" for the defendant's rights.   The question mentioned the defendant's attorney's attempt to engage in plea negotiations. In spite of the obvious error, the court found support in the record to conclude that the nature of the question did not show an intention to cause a mistrial.   For the reasons just outlined, here we find that the state courts' determination that

17

the prosecutor did not intend to provoke a mistrial was not clearly erroneous.

B.   Petitioner's claim that the state courts improperly applied federal constitutional law does not support habeas relief.

Petitioner's second argument in support of his double jeopardy claim is that the state courts unreasonably applied the clearly established federal law standard in Oregon v. Kennedy, supra, for determining a double jeopardy violation.   Petitioner contends that while the Kennedy case requires proof that the prosecutor intentionally acted to provoke a mistrial, Kansas courts in State v. Dumars, 154 P.3d 1120 (Kan.App. 2007) and State v. Morton, 153 P.3d 532 (Kan. 2007) have required additional evidence of "bad faith," "egregious prosecutorial misconduct," and substantial prejudice to the right to a fair trial.

The Kansas Court of Appeals rejected this argument upon direct appeal on the grounds that "the record does not support and [petitioner] does not allege, that the district court in this case departed from Kennedy by applying a heightened standard."   2010 WL 5490723 at *4.   The court has reviewed the transcript of the hearing upon the motion to dismiss.   We conclude that the Kansas Court of Appeals made a reasonable finding.   We note that the trial judge did not mention the

18

additional factors alleged by petitioner in the judge's discussion of the motion.

Petitioner asserts that the Kansas Court of Appeals, itself, applied the so-called heightened Dumars and Morton standards on direct appeal because the court cited Dumars and Morton soon after finding that it did not need to decide the heightened standard argument.  We reject this contention.  Yes, the Kansas Court of Appeals did refer to Dumars and Morton, but not to support a heightened standard for a double jeopardy claim.  The cases were cited merely for the undisputed position that there must be proof that the prosecutor intended to provoke the defense to move for a mistrial.  Id.  Petitioner also asserts that the court should find that the alleged heightened standard was applied by the trial court because it is presumed that a Kansas court applies the law of Kansas.  The court believes the transcript of the motion to dismiss is sufficient to overcome any presumption which might exist that a heightened standard was applied in this instance.

Finally, we reject petitioner's contention that the Kansas courts in Dumars and Morton applied a heightened standard for finding a double jeopardy violation.  The references to "bad faith" or "egregious prosecutorial misconduct" or "substantial prejudice" seem to be descriptive as opposed to prescriptive.  Such conduct might be more likely to support a finding that a

prosecutor's misconduct intended to goad a defendant into seeking a court-ordered mistrial.[2]   But, the Kansas courts were not requiring that such conduct be shown in every case.

C.   Petitioner's remaining arguments do not support relief upon double jeopardy grounds.

Petitioner's third attack upon the state courts' double jeopardy findings asserts that the decisions were based upon an unreasonable determination of the facts.   This argument is more or less a repeat of the prior contention that the facts show the prosecutor intended to provoke petitioner's motion for a mistrial.   The court has reviewed the facts and the record.   We reiterate that a reasonable factfinder could decide that the prosecutor did not intentionally goad petitioner into asking for a mistrial.   Petitioner's claim to the contrary is not supported by clear and convincing evidence.

V.   PETITIONER'S CLAIM OF A DOYLE VIOLATION DOES NOT MERIT HABEAS RELIEF.

Petitioner contends that he is entitled to habeas relief because the prosecutor in his closing argument made remarks which improperly commented upon petitioner's right to remain silent, contrary to Supreme Court precedent.

In Doyle v. Ohio, 426 U.S. 610 (1976), the Supreme Court held that a prosecutor may deprive a criminal defendant of his

---

[2] In Kennedy, the Court actually rejected "bad faith" as being too broad of a standard of prosecutorial misconduct to apply to double jeopardy claims.   456 U.S. at 674-76.

right to due process by making improper comments about his post-Miranda silence.   The Court held that it was unfair, when an accused invoked his right to remain silent after receiving a Miranda warning, for the prosecution to use the accused's silence to impeach his testimony at a later trial.   426 U.S. 619.   In Battenfield v. Gibson, 236 F.3d 1215, 1225 (10th Cir. 2001), the Tenth Circuit said  that "the question is whether the language used by the prosecutor was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." (interior quotations omitted).

The  comments  petitioner  attacks  are  described  in  section II(D) of this opinion.  The Kansas Court of Appeals decided that the  closing  argument  did  not  violate  Doyle  because  the prosecutor was merely attacking the credibility of petitioner's testimony with inconsistent statements petitioner had previously made.  2010 WL 5490723 at *6.  This decision must be upheld upon habeas  review  unless  it  is  "contrary  to,  or  involved  an unreasonable application of clearly established Federal law, as determined  by  the  Supreme  Court  of  the  United  States."   § 2254(d)(1).

Upon review, the state court's holding appears reasonable. The prosecutor contrasted petitioner's statements when he was arrested with his testimony at trial  and with the statements

other witnesses made when they were arrested and then testified later at trial. Petitioner highlights the prosecutor's references to the time when statements were made or the time which elapsed between petitioner's statements when he was arrested and when he testified at trial. Petitioner also emphasizes that the prosecutor stated that petitioner had time to prepare his testimony taking into account the other evidence that had been gathered. It is reasonable to conclude, however, that a jury would not consider these statements to be a comment upon petitioner's right to remain silent. Rather, as the Kansas Court of Appeals determined, the comments could reasonably be considered a reference to petitioner's statements (which were inconsistent), not to petitioner's <u>failure</u> to make a statement. As made clear in <u>Anderson v. Charles</u>, 447 U.S. 404, 407-08 (1980), such remarks do not violate the holding of <u>Doyle</u>. It is also reasonable to consider a reference to a defendant's ability to consider other evidence before testifying, as a comment upon credibility and the normal elements of case management and trial procedure, not as a comment upon the exercise of the right to remain silent. See <u>Portuondo v. Agard</u>, 529 U.S. 61, 75 (2000)(remark that defendant had a "big advantage" of listening to other testimony before testifying does not deprive defendant of a fair trial by penalizing him for exercising his right to attend his trial). In sum, it was reasonable, and not contrary

22

to established Supreme Court precedent, to conclude that the
prosecutor's closing argument was proper.[3]

VI. CONCLUSION

For the above-stated reasons, petitioner's application for
habeas relief shall be denied.

VII.  CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases in the
United States District Courts instructs that "[t]he district
court must issue or deny a certificate of appealability when it
enters a final order adverse to the applicant."  Pursuant to 28
U.S.C. § 2253, the court may issue a certificate of
appealability "only if the applicant has made a substantial
showing of the denial of a constitutional right," and the court
"indicates which specific issue or issues satisfy [that]
showing."  A petitioner can satisfy that standard by
demonstrating that the issues raised are debatable among
jurists, that a court could resolve the issues differently, or
that the questions deserve further proceedings.  Slack v.

---

[3] The remarks highlighted by petitioner are not unlike those challenged in
U.S. v. Mora, 845 F.2d 233, 234-35 (10th Cir.) cert. denied, 488 U.S. 995
(1988) where a Doyle claim was denied.  In Mora, the prosecutor in closing
argument stated:
    "Consider also the fact that Sharlene Fischer [a coconspirator
    who had pleaded guilty] gave her statement after she was
    arrested.  She didn't wait two months and talk to her attorney .
    . . She told what she knew right after she was arrested and
    Buckey Buckmaster [another coconspirator who had pleaded guilty]
    did so within a month … So when you view their credibility,
    consider the fact that they've entered a plea agreement but
    consider whether or not they're corroborated and consider when
    they gave those statements or whether they waited months and
    months to think up a story and come in here and tell you."

McDaniel, 529 U.S. 473, 483-84 (2000)(citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).  The court concludes that a certificate of appealability should not issue in this case. Nothing suggests that the court's ruling resulting in the dismissal of this action is debatable or incorrect.  The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently.  A certificate of appealability shall be denied.

**IT IS THEREFORE BY THE COURT ORDERED** that this petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 is denied and a certificate of appealability is denied.

**IT IS SO ORDERED.**

**Dated this 24th day of February, 2015, at Topeka, Kansas.**

**s/Sam A. Crow**
**U. S. Senior District Judge**